UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
CAFFELE MORGAN,

                    Plaintiff,                 **<u>MEMORANDUM and ORDER</u>**

       — against —                03-CV-5109 (SLT) (WDW)

NASSAU COUNTY, NASSAU POLICE
DEPARTMENT, P.O. REGANESHI [2466],
P.O. LEACH, P.O. R. BISI, SUNRISE CINEMAS,
S.E.B. A/K/A SECURITY ENFORCEMENT
BUREAU, INC., RAYMOND SMITH (SG),
GONZALO ARZON (SG), *et al.*;

                 Defendants.
------------------------------------------------------------X
**TOWNES, United States District Judge:**

      Caffele Morgan ("Plaintiff") brings this action under 42 U.S.C. § 1983 for violation of

his Fourth, Fifth, and Fourteenth Amendment rights arising from his arrest after a disturbance at

a movie theater on October 13, 2002. Plaintiff claims that police officers violated his rights by

arresting him without probable cause, using excessive force against him, not reading him his

*Miranda* rights, denying him medical attention, denying him the use of the bathroom, and

maliciously prosecuting him. He also brings pendent state law claims of false arrest, false

imprisonment, assault and battery, negligence, and malicious prosecution against the police

officers and other private parties associated with the events of that day. All Defendants now

move for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the following

reasons, Defendants' motion is granted in part and denied in part.

### *BACKGROUND*

      On October 13, 2002, at approximately 3:08 p.m., Nassau County police officers were

called to the Sunrise Cineplex movie theater in Valley Stream, New York. Pl. Nassau County's

("N.C.") Ex. 1, N.C. Police Dep't Dispatch Printout. Several individuals had called 911

reporting a disturbance at the Cineplex, and some indicated that one person had a knife and had suffered head injuries. *Id*. By the time the first officer, defendant Officer Gasper Arbisi, arrived on the scene, the disturbance had subsided. Arbisi Dep. 19. Arbisi found Plaintiff sitting curbside in front of the theater with a head injury. *Id*. at 24, 42.

Plaintiff recounts that, on that day, he was on his way home from a flea market located behind the Cineplex with his girlfriend, Anna Mae Legister, when he was flagged down and invited into the Cineplex by defendant Raymond Smith, a security guard at the theater. Pl. Dep. 26. Initially, a friendly conversation ensued between Plaintiff, Smith and the head of security at the Cineplex, Keith English. *Id*. at 46-47, 55; English Aff. ¶¶ 5-6. At some point, the conversation turned heated between Plaintiff and Smith. *Id*. English tried to diffuse the verbal argument by telling Plaintiff to leave the theater and instructing Smith to return to his post. English Aff. ¶ 6. Plaintiff proceeded to leave, but was continuously taunted by Smith, who ignored repeated instructions to return to his post by English. *Id*. at ¶¶ 7-8. After Plaintiff had made his way outside the Cineplex, Smith lunged at Plaintiff, swung his fist at Plaintiff, punched him, grabbed him by the collar, and then pushed Plaintiff against the outdoor window of the movie theater. Pl. Dep. 59, 61-63. English and Legister attempted to separate and pull Smith from Plaintiff, while another security guard, defendant Gonzalo Arzon, held Plaintiff's arms. *Id*. at 63-64. Unprovoked, Smith then drew his night stick and struck Plaintiff on the head with sufficient force to render him unconscious. English Aff. ¶ 9-10; Pl. Aff. ¶ 5. As Plaintiff regained consciousness and staggered toward his car, he observed Smith coming toward him again. Pl. Dep. 70, 73. Plaintiff grabbed onto Smith around his neck in an attempt to immobilize him. *Id*. Smith then fell on top of Plaintiff causing his head to hit the ground. *Id*. at 74.

Eventually, some witnesses to the disturbance assisted in getting Smith off Plaintiff and helping Plaintiff from the ground. *Id.* at 75.

Unsurprisingly, defendant Smith has a different version of events on that day. According to a supporting deposition given to the police on the scene, Smith relates that he and Plaintiff were involved in a verbal altercation, when Plaintiff said, "I should cut you." N.C. Defs. Ex. E, Smith Supp. Dep. Smith responded, "you're not going to cut anyone" and walked away. *Id.* Arzon then warned Smith to look out and Plaintiff came at Smith swinging his fist but missing. *Id.* Smith then pulled out his night stick to defend himself as Plaintiff brandished a red-handled box cutter and extended the blade. *Id.* As Arzon attempted to grab Plaintiff's arm, Smith grabbed Plaintiff's neck and then hit him with his night stick. *Id.* Smith then tried to contain Plaintiff, but was punched in the face by Plaintiff in the process. *Id.* After the Cineplex's manager broke up the fight, Plaintiff again charged and tackled Smith until Arzon threatened to mace Plaintiff. *Id.* In this deposition, Smith stated that he wanted Plaintiff arrested. *Id.*

Defendant Arzon's supporting deposition reveals a slightly different set of facts. He overheard a verbal exchange between Plaintiff and Smith and then saw Plaintiff swing at Smith but miss. N.C. Defs. Ex. E, Arzon Supp. Dep. Plaintiff then pulled out a box cutter, extended its blade, and pointed it toward Smith. *Id.* At some point, Plaintiff gave the box cutter to Legister, who concealed it in her waistband. *Id.* Legister initially refused to give the box cutter to Arzon, but she handed it over when Arzon placed his hand on his weapon. *Id.* Arzon next saw Plaintiff slam Smith to the ground causing his head to hit the cement and then place Smith in a headlock. *Id.* Arzon threatened to mace Plaintiff until he released Smith. *Id.*

At this point, the ambulance and police began to arrive. Defendant Officer Frederick Renganeschi, another officer who arrived on scene, spoke to both Smith and Arzon and took supporting depositions from each of them. Renganeschi Dep. 15. Renganeschi observed that Smith had an injury to his head. *Id*. at 23. According to Renganeschi, he also spoke to Plaintiff while he was being treated in the back of the ambulance, and Plaintiff admitted he had a box cutter. *Id*. at 16. While Renganeschi maintains that Plaintiff was not under arrest while they were speaking in the back of the ambulance, he stated that he made the decision to arrest Plaintiff based on his assessment of the crime scene and interviews of eyewitnesses including the security guards and Plaintiff. *Id*. at 17. Renganeschi determined that Plaintiff was not at the movie theater to see a movie but to confront Smith and that Plaintiff was the aggressor, taking the first swing. *Id*. at 43.

At some point, Officer Arbisi placed handcuffs on Plaintiff, effecting his arrest. Arbisi 49. Plaintiff was taken via ambulance to the emergency room at Franklin General Hospital for his head injuries. Pl. Dep. 82. At the hospital, he was examined by a doctor and given a CAT scan and stitches on his head. *Id*. at 82-84. He was later transported to the police precinct and charged with Third Degree Assault, Second Degree Menacing, and Fourth Degree Possession of a Dangerous Weapon. *Id*. at 146; N.C. Defs. Ex. G, N.C. Police Dep't Crime Report. After being processed at the precinct, Plaintiff was released on bail at 12:19 a.m. on October 14, 2002. N.C. Defs. Ex I, N.C. Police Dep't Appearance Ticket. A criminal prosecution commenced against Plaintiff, which was eventually dismissed pursuant to New York Criminal Procedure Law § 170.30(1)(f) ("There exists some other jurisdictional or legal impediment to conviction of the defendant for the offense charged"). Pl. N.C. Ex. 2, Certificate of Disposition.

Plaintiff initiated the instant action on October 8, 2003, against two sets of defendants: (1) Nassau County, the Nassau County Police Department, and Officers Reganeschi, Leach, and Arbisi and other unnamed officers ("Defendant Officers") (hereinafter collectively known as the "Nassau County Defendants"); and (2) Sunrise Cinemas and its owner, National Amusements, Inc., Raymond Smith, Gonzalo Arzon, and their employer, S.E.B Services of New York ("S.E.B.") (hereinafter collectively the "Non-Nassau County Defendants"). On September 27, 2006, the Nassau County Defendants moved for summary judgment. One day later, the Non-Nassau County Defendants followed suit. The Court now turns to these motions.

## DISCUSSION

## I.      Summary Judgment Standard

Summary judgment is appropriate only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[G]enuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, [while] materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." *Mitchell v. Washingtonville Cent. Sch. Dist.*, 190 F.3d 1, 5 (2d Cir. 1999) (internal quotation marks omitted). The moving party bears the burden of showing that there is no genuine issue of fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986). If the movant meets this burden, the non-movant "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *W. World Ins. Co. v. Stack Oil, Inc.,* 922 F.2d 118, 121 (2d Cir. 1990). The non-movant cannot avoid summary judgment "through mere

speculation or conjecture" or "by vaguely asserting the existence of some unspecified disputed material facts." *Western World*, 922 F.2d at 121 (internal quotation marks omitted).

When evaluating a motion for summary judgment, "[t]he court must view the evidence in the light most favorable to the party against whom summary judgment is sought and must draw all reasonable inferences in his favor." *L.B. Foster Co. v. Am. Piles, Inc.*, 138 F.3d 81, 87 (2d Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). No genuine triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *Chertkova v. Conn. Gen. Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996). "If the evidence [presented by the non-moving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (internal quotation marks omitted) (alteration in original).

## II.     Nassau County Defendants' Summary Judgment Motion

Plaintiff brings this action against Nassau County Defendants ("N.C. Defendants") under 42 U.S.C § 1983 for infringement of his Fourth, Fifth, and Fourteenth Amendment rights. He claims that N.C. Defendants violated his rights by arresting him without probable cause, maliciously prosecuting him, using excessive force against him, not reading him his *Miranda* rights, denying him medical attention, and denying him the use of the bathroom. He also brings pendent state law claims of false arrest, assault and battery, negligence, and malicious prosecution. N.C. Defendants seek summary judgment dismissing all claims. The Court grants N.C. Defendants' motion in part and denies it in part.

## A.    False Arrest

The Court first turns its attention to Plaintiff's false arrest cause of action against Defendant Officers.  A § 1983 claim for false arrest derives from the right to be free from unreasonable searches and seizures, including the right to be free from arrest absent probable cause.  *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996).  "Whenever there has been an arrest and imprisonment without a warrant, the officer has acted extrajudicially and the presumption arises that such an arrest and imprisonment are unlawful."  *Peterson v. County of Nassau*, 995 F. Supp. 305, 313 (E.D.N.Y. 1998) (quoting *Broughton v. State*, 37 N.Y.2d 451, 456 (1975)).  Nevertheless, the existence of probable cause gives an officer the privilege to arrest and "is a complete defense to an action for false arrest" under § 1983.  *Bernard v. United States*, 25 F.3d 98, 102 (2d Cir. 1994); *see also Weyant*, 101 F.3d at 852.

Probable cause to arrest exists when authorities have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to cause a person of reasonable caution to believe that the person to be arrested has committed or is committing a crime.  *Weyant*, 101 F.3d at 852.  It requires only a "probability" or a "substantial chance" that a crime has taken or is taking place.  *United States v. Bakhtiari*, 913 F.2d 1053, 1062 (2d Cir. 1990) (quoting *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983)); *cf. United States v. Gaskin*, 364 F.3d 438, 457 (2d Cir. 2004) ("The standard does not demand certainty but only a 'fair probability' that contraband or evidence of a crime will be found.").  Whether or not there was probable cause to arrest depends on the information available at the time of the arrest, *Peterson*, 995 F. Supp. at 313, judged against the "totality of the circumstances," *Williams v. City of New York,* No. 02-CV-3693, 2003 WL 22434151, at *3 (S.D.N.Y. Oct. 23, 2003) (citing *Gates*, 462

U.S. at 233). The plaintiff bears the burden of demonstrating a lack of probable cause for the arrest. *Id.* (citing *Baker v. McCollan*, 443 U.S. 137, 143-46 (1979)).

N.C. Defendants contend that ample evidence supports the probable cause determination to justify Plaintiff's arrest. According to N.C. Defendants, Officers Renganeschi and Arbisi arrived on scene after the disturbance subsided. At that time, Arbisi observed Plaintiff sitting curbside in front of the theater bleeding from the head and Renganeschi saw that Raymond Smith sustained a head injury. Renganeschi then conducted an investigation which included, among other things, interviewing the theater's security guards, Plaintiff, and Plaintiff's girlfriend, Anna Mae Legister. Renganeschi Dep. 17. Gonzalo Arzon, one of the security guards at the theater, informed Renganeschi that Plaintiff charged Smith and threatened him with a box cutter and that Plaintiff slammed Smith to the ground. Smith told Renganeschi that Plaintiff attacked him, that he used his night stick in self-defense, and that he wanted Plaintiff arrested. Both Smith and Arzon signed supporting depositions, which subjected them to misdemeanor charges for making false charges. *See* N.C. Defs. Ex. E, Smith and Arzon Supp. Dep. The officers determined that Plaintiff was not present at the movie theater to see a movie and they recovered a box cutter from the scene. Renganeschi spoke to Plaintiff in the ambulance and Plaintiff admitted to having a box cutter. Based on these facts, Renganeschi made the decision to arrest Plaintiff for Third Degree Assault, Second Degree Menacing, and Fourth Degree Possession of a Dangerous Weapon.[1] Arbisi effected Renganeschi's decision by placing the handcuffs on Plaintiff while he was being treated in the ambulance.

---

[1] The Renganeschi deposition transcript reads,

> Q. Who made the decision to arrest Mr. Morgan?
> A. I did.

Plaintiff challenges this version of events and argues that a genuine issue of material fact exists as to whether the officers conducted an investigation prior to his arrest. According to affidavits submitted by Plaintiff and Legister, Arbisi arrested Plaintiff immediately upon his arrival at the Cineplex before the officers could have conducted any meaningful investigation to form probable cause. Plaintiff maintains that such a dispute of fact would preclude summary judgment in this case.

Plaintiff's affidavit conveys that Arbisi grabbed him while he was seated on the sidewalk in front of the movie theater and stated, "Caffele your [sic] under arrest." Pl. Aff. ¶¶11-12. The affidavit states that Arbisi then proceeded to cuff Plaintiff's hands behind his back and walk him to the ambulance. *Id*. at ¶¶12, 14. Legister's affidavit gives a more fulsome description of events, which, if credited, presents a dispute of fact. She maintains that Arbisi was the first officer on the scene and she was the first person to speak to him. Legister Aff. ¶ 10. Arbisi asked her some "pedigree questions" like her name and what happened. *Id*. Arbisi then asked her if she knew who the victim and perpetrators were. *Id*. Legister states in her affidavit:

> I responded by saying that the victim was my boyfriend Caffele, but before I could say Caffele's last name, P.O. Arbisi filled it in for me saying[,] is it Caffele Morgan[?] I responded Yes. Then he asked me where Mr. Morgan was[,] I pointed to the sidewalk where Mr. Morgan was seated at the same time I could see that the ambulance technicians had arrived and were talking to or treating Mr. Morgan. To [m]y surprise, P.O. Arbisi, immediately stopped asking me questions and went over to Mr. Morgan, seconds later Mr. Morgan was in handcuffs and being walked to the ambulance.

*Id.*

---

Q.  Based on you assessing the scene of the crime, the incident, and speaking to eyewitnesses including the security guards and Mr. Morgan, you made a decision to place him under arrest?

A.  That's correct.

Renganeschi Dep. 17:8-10, 20-24.

9

According to Legister, Arbisi walked directly to Plaintiff, placed handcuffs on him and walked Plaintiff to the ambulance. *Id*. at ¶ 11. She alleges that she did not see Arbisi speak to any other witnesses that were present and she was the first and only person to speak to him before he arrested Plaintiff. *Id*. at ¶ 12.

Thus, according to Plaintiff's and Legister's version of events, Arbisi immediately recognized Plaintiff and arrested him prior to any investigation by himself, Renganeschi or the other officers. Challenging the assertion that Plaintiff was arrested in the ambulance after the investigation, these affidavits indicate that Plaintiff was handcuffed before he was treated in the ambulance. Furthermore, these accounts are possible given Officer Arbisi's deposition testimony that he believed that he placed the handcuffs on Plaintiff outside of the ambulance and then walked him to the ambulance. Arbisi Dep. 49-50.[2] Although Arbisi does not indicate exactly at what point he handcuffed and arrested Plaintiff, it could be argued that Arbisi's deposition testimony supports Plaintiff's claims that the arrest occurred immediately upon his arrival and thus contradicts N.C. Defendants' assertion that Plaintiff was arrested as he was treated in the ambulance after an investigation. Plaintiff alleges that Arbisi arrested him prior to an investigation in bad faith because of a previous complaint that Plaintiff filed against Arbisi. *See* Arbisi Dep. 55; Pl. Aff. ¶ 19. Under this scenario, Plaintiff contends, no probable cause

---

[2] Arbisi's deposition states:

> Q. Did you ever place handcuffs on him in the back of [sic] ambulance?
> A. I believe the handcuffs were placed on him outside the ambulance.
> Q. Do you know who by?
> A. By myself.
> Q. Then he was led to the ambulance?
> A. I believe so.
> Q. Did you walk him to the ambulance?
> A. I believe so.

Arbisi Dep. 49-50.

existed at the time of his arrest because Arbisi conducted no investigation prior to arresting him. Plaintiff contends that the putative investigation was initiated after his arrest and cannot be used to create probable cause *ex post facto*.[3] This scenario would give rise to a genuine issue for trial because "court[s] look[] only to the information that the arresting officer had at the time of the arrest." *Peterson*, 995 F. Supp. at 313.

These affidavits, however, contradict Plaintiff's deposition testimony. Belying the characterization that Arbisi handcuffed Plaintiff on the sidewalk and walked him to the ambulance, Plaintiff, in his deposition testimony, clearly states that Legister and an ambulance technician helped him into the ambulance where he started receiving treatment for his head injury. Pl. Dep. 123-24. Plaintiff recounts that he did not encounter Officer Arbisi until after he was in the ambulance. *Id*. at 122, 126. According to his deposition testimony, Arbisi placed handcuffs on him at that point.[4] Furthermore, Plaintiff again asserts a contradictory version of

---

[3]   As further evidence of the alleged sham investigation, Plaintiff claims that the officers failed to procure or even view the Cineplex's video surveillance cameras which would have captured the altercation on film and that the officers ignored exculpatory evidence given by the head of the Cineplex's security, Keith English, who placed the 911 call about the disturbance and allegedly identified Smith as the aggressor.

[4]   Plaintiff's deposition reads:

> Q.   When you went into the back of the ambulance at first were you handcuffed?
> A.   No, sir.
>
> * * *
>
> Q.   And you said, I believe you said that the person in the uniform and Anna Mae helped you into the ambulance?
> A.   I think I walked inside.
> Q.   Can you tell me, please, how they helped you, what specifically they did?
> A.   I think he held me under my arm right here, and, you know, just to make sure I didn't fall or anything again, and I went inside and I sat down.
>
> * * *
>
> Q.   What happened next after you were placed in the ambulance?
> A.   After I was placed in there Mr. R. Bisi [i.e., "Arbisi"] came inside, and I remember he cuffed me, . . . .

historical facts in his opposition papers to Non-Nassau County Defendants' motion for summary judgment.  In those papers, Plaintiff states that it is "undisputed[]" that the security guards spoke to the police *before* Plaintiff's arrest and that the police relied on the information by the security guards to arrest, incarcerate, and prosecute him.  Pl.'s Mem. Law. & Affirm. Opp'n Non-Nassau Co. Defs. Mot. Sum. J. 11, 13.

It has long been a cardinal rule in the Second Circuit that "a party may not create an issue of fact by submitting an affidavit in opposition to a summary judgment motion that, by omission or addition, contradicts the affiant's previous deposition testimony."  *Hayes v. N.Y. City Dep't of Corrs.*, 84 F.3d 614, 619 (2d Cir. 1996) (citing *Perma Res. & Dev. Co. v. Singer Co*., 410 F.2d 572, 578 (2d Cir. 1969)).  The rule is necessary because "if a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment as a procedure for screening out sham issues of fact."  *Perma Res. & Dev. Co.,* 410 F.2d at 578.  Thus, "factual issues created solely by an affidavit crafted to oppose a summary judgment motion are not 'genuine' issues for trial."  *Hayes*, 84 F.3d at 619 (quoting *Perma Res & Dev. Co.*, 410 F.2d at 578).  Nevertheless, the so-called "sham affidavit rule" does not apply where "evidence other than the deponent's subsequent affidavit" contradicts the prior sworn testimony, "for when such other evidence is available, the concern that the proffered issue of fact is a mere 'sham' is alleviated."  *Palazzo ex rel. Delmage v. Corio*, 232 F.3d 38, 43-44 (2d Cir. 2000).

Here, the sham affidavit rule does not apply because Officer Arbisi's deposition testimony is evidence other than the deponent's subsequent affidavit that directly contradicts

---

Pl. Dep. 124:25–125:2-3; 125:14-22; 126:8-11.

Plaintiff's deposition testimony that he was first handcuffed inside the ambulance. The fact that an opposing party's testimony bolsters the affidavits and conflicts with Plaintiff's prior deposition sufficiently precludes the Court from disregarding Plaintiff's affidavit. *See Sea Trade Co., Ltd. v. FleetBoston Fin. Corp.*, No. 03-CV-10254, 2008 U.S. Dist. LEXIS 67221, at *57-62 (S.D.N.Y. Sept. 4, 2008) (holding that sham affidavit rule does not apply to a contradictory affidavit corroborated by the affidavits of the plaintiff's long-term employee, lawyer, and, most notably, the defendant's employee).

Under these circumstances, if a jury were to believe Plaintiff's contention that he was arrested immediately upon Arbisi's arrival, the existence of probable cause would be in doubt. Accordingly, the Court finds a genuine issue of material fact as to whether probable cause existed at the time of Plaintiff's arrest and denies summary judgment on the false arrest claim as to N.C. Defendant Officers. *See Murphy v. Lynn*, 118 F.3d 938, 947 (2d Cir. 1997) ("[W]here the question of whether an arresting officer had probable cause is predominantly factual in nature, as where there is a dispute as to the pertinent events, the existence *vel non* of probable cause is to be decided by the jury.").

### B.     Malicious Prosecution

The Court next examines Plaintiff's malicious prosecution cause of action against Defendant Officers. To state a 42 U.S.C. § 1983 claim for malicious prosecution, a plaintiff must allege the four elements of malicious prosecution under New York state law and the deprivation of a constitutional right. *Rohman v. N.Y.C. Transit Auth.,* 215 F.3d 208, 215 (2d Cir. 2000). The elements of malicious prosecution under New York law are (1) that the defendant commenced a criminal proceeding against the plaintiff; (2) that the proceeding was terminated in

the plaintiff's favor; (3) that there was no probable cause for the initiation or continuation of the proceeding; and (4) that the defendant acted with malice. *Rothstein v. Carriere*, 373 F.3d 275, 282 (2d Cir. 2004). A constitutional claim for malicious prosecution under § 1983 adds an additional element: (5) "a sufficient post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights." *Rohman*, 215 F.3d at 215; *see also Singer v. Fulton County Sheriff*, 63 F.3d 110, 116 (2d Cir. 1995) ("A plaintiff asserting a Fourth Amendment malicious prosecution claim under § 1983 must . . . show some deprivation of liberty consistent with the concept of 'seizure.'").

### 1. Favorable Termination

The Court begins this inquiry with the second element of a New York malicious prosecution claim – the "favorable termination" factor. As the Second Circuit has noted, New York courts have reached "varying results" in favorable termination cases that are "difficult to reconcile" and lead to some "confusion" in the law. *O'Brien v. Alexander*, 101 F.3d 1479, 1486 (2d Cir. 1996) (quoting *Lopez v. City of New York*, 901 F. Supp. 684, 688 (S.D.N.Y. 1995)). Under New York state law, it is clear that the plaintiff bears the burden of establishing that the underlying criminal action terminated in his favor. *MacFawn v. Kresler*, 88 N.Y.2d 859, 860 (1996).

The "leading case on the subject" of favorable termination is *Halberstadt v. New York Life Insurance Co.,* 194 N.Y. 1, 10-11 (1909), where the New York Court of Appeals stated:

> The first [rule] is that where a criminal proceeding has been terminated in favor of the accused by judicial action of the proper court or official in any way involving the merits or propriety of the proceeding or by a dismissal or discontinuance based on some act chargeable to the complainant as his consent or his withdrawal or abandonment of his prosecution, a foundation in this respect has been laid for an action of malicious prosecution. The other and reverse rule is that where the proceeding has been terminated without regard to its merits or propriety by

14

agreement or settlement of the parties or solely by the procurement of the accused as a matter of favor or as the result of some act, trick or device preventing action and consideration by the court, there is no such [favorable] termination . . . .

*O'Brien*, 101 F.3d at 1486.

From *Halberstadt*, the Second Circuit has discerned two principle ways to establish favorable termination:  (1) "an adjudication of the merits by the tribunal in the prior action," or (2) "an act of withdrawal or abandonment on the part of the party prosecuting the prior action." *O'Brien*, 101 F.3d at 1486.

Nevertheless, the later progeny of *Halberstadt* has cast doubt of the efficacy of the latter, abandonment prong.  *Id*.  In *MacFawn*, 88 N.Y.2d at 860, the New York Court of Appeals "ignored" the abandonment prong and "recast" *Halberstadt* to hold that a favorable termination exists only where the "final disposition of the proceeding involves the merits and indicates the accused's innocence."  *O'Brien*, 101 F.3d at 1487; *see also Hollender v. Trump Vill. Coop., Inc*., 58 N.Y.2d 420, 425-26 (1983) ("In a malicious prosecution action, it is for the one who brings the suit to establish that the criminal proceeding . . . terminated in favor of the accused.  Indeed, it is 'only when [the] . . . final disposition is such as to indicate . . . innocence' that this burden is met.").  The Second Circuit has interpreted *MacFawn* and similar cases to signal the "atrophy" of the "abandonment prong" of *Halberstadt*.  *O'Brien*, 101 F.3d at 1487 (collecting cases).

Yet, in more recent years, the New York Court of Appeals has begun to flex the "abandonment prong," holding that dismissal on speedy trial grounds is a favorable termination. *Smith-Hunter v. Harvey,* 95 N.Y.2d 191, 198 (2000).  The court noted that "dismissal without prejudice qualifies as a final, favorable termination if the dismissal represents 'the formal abandonment of the proceedings by the public prosecutor.'"  *Id*. (citing Restatement (Second) of

Torts § 659(c)). The court then found that a speedy trial dismissal, which is premised on a

"prosecutor's inaction," constitutes a favorable termination. *Id.* The court added that *MacFawn*

and similar cases stand only for the proposition that "dispositions inconsistent with innocence . . .

cannot be viewed as favorable to the accused." *Id.* Thus, the court suggested that a malicious

prosecution claim does not require that a plaintiff prove his innocence or even that the

termination be indicative of innocence, rather the plaintiff's burden is to demonstrate a final

termination that is not inconsistent with innocence. *Id.*; *see also Cantalino v. Danner*, 96 N.Y.2d

391, 396 (2001) ("[T]he question is whether, under the circumstances of each case, the

disposition was inconsistent with the innocence of the accused.").[5]

　　With this legal backdrop, the Court turns to Plaintiff's case. A criminal proceeding was

initiated against Plaintiff by Assistant District Attorney Kevin Kanesake. On the eve of trial,

Kanesake recommended dismissal of the case pursuant to N.Y. CRIM. PROC. LAW § 170.30(1)(f)

("There exists some other jurisdictional or legal impediment to conviction of the defendant for

the offense charged"). Pl. N.C. Ex. 2, Certificate of Disposition; Kanesake Aff. ¶ 6.[6] In an

---

[5]  The court explained that certain types of terminations are "not favorable" under the
abandonment prong because they are inconsistent with innocence. For example, a termination is
not favorable where the government does not proceed because the accused's misconduct
prevents a proper trial, where the prosecution ends due to a compromise with the accused, or
where charges are dismissed out of mercy because "mercy presupposes the guilt of the accused."
*Cantalino*, 96 N.Y.2d at 395. An abandonment brought about by the accused's assertion of a
constitutional or other privilege, such as the right to a speedy trial, does not fall within the
category of "not favorable" terminations because "the accused should not be required to
relinquish such a privilege in order to vindicate his right to be free from malicious prosecution."
*Murphy*, 118 F.3d at 949.

[6]  No federal or state case has decided whether the disposition of a criminal proceeding pursuant
to N.Y. CRIM. PROC. L. § 170.30(1)(f) constitutes a *per se* "favorable" or "not favorable"
termination. In *Norton v. Town of Islip*, 2009 WL 804702, at *4, 8 (E.D.N.Y. March 27, 2009),
Judge Garaufis suggests without analysis that a § 170.30(1)(f) termination may be a favorable
termination. In the case, Judge Garaufis permitted a malicious prosecution claim to survive
summary judgment where the criminal proceeding was terminated partly because of a "legal
impediment to conviction of the defendant for the offense charged." *Id.* at *4. Although Judge

16

affidavit before this Court, Kanesake affirms that the sole reason for the dismissal of the case was the unavailability of the complainant/witness, security guard Raymond Smith. Kanesake Aff. ¶ 7. According to Kanesake, Smith moved to Georgia and could not be located prior to trial despite repeated attempts to contact him. *Id*. at ¶¶ 9-10. Kanesake states that he would have continued with the prosecution if Smith had been available. *Id*. at ¶ 8. On the other hand, Plaintiff's defense attorney in the criminal proceeding contends that the dismissal was prompted by the trial judge after the accusation of a *Brady* violation. O'Keke Aff. ¶ 7. Plaintiff's defense believed that Kanesake withheld exculpatory information from the defense and the court held an evidentiary hearing to consider whether Kanesake could be called as a witness. *Id*. at ¶¶ 6-7. Afterward, according to Plaintiff, the district attorney's office was "advised by the court to dispose of the criminal case, and the trial was adjourned shortly." *Id*. at ¶ 7.

Viewing the facts in the light most favorable to Plaintiff, the Court finds that Defendants' proffered reason for the dismissal of the case against Plaintiff constitutes a formal abandonment of the proceeding and thus is a favorable termination for Plaintiff. First, the *Halberstadt* rule squarely notes that a dismissal "based on some act chargeable to the complainant" lays the foundation for malicious prosecution claim. 194 N.Y. at 10-11. In this case, Smith alleged that Plaintiff attacked him with a box cutter and asked that Plaintiff be arrested. Smith later left the state and failed to return to testify against Plaintiff leading to the dismissal of the charges. In such a situation, the dismissal should redound in favor of the accused, who is no longer given a chance to vindicate his or her rights against an accuser who has made himself unavailable. Indeed, "[t]he law should not require one who is [potentially] falsely and maliciously accused to

---

Garaufis did not analyze this issue, his ruling is suggestive that a § 170.30(1)(f) termination may be a favorable one.

proceed to trial—incurring additional financial and emotional costs—as a prerequisite to recovery for malicious prosecution." *Smith-Hunter*, 95 N.Y.2d at 199.

Second, the dismissal based on the failure of the complainant to appear is equivalent to a failure to prosecute. Without the appearance of the complainant, Kanesake presumably concluded that he could not secure a conviction and he, therefore, decided to terminate the prosecution. Such a situation should again go to the benefit of the accused because "the failure to proceed to the merits compels an inference of such an unwillingness or inability to do so as to imply a lack of reasonable grounds for the prosecution." *Loeb v. Teitelbaum*, 432 N.Y.S.2d 487, 493 (N.Y. App. Div. 1980). Considering that the dismissal based on Smith's failure to testify was not inconsistent with Plaintiff's innocence and that the declaration of an "impediment to conviction" under § 170.30(1)(f) demonstrates a "formal abandonment" of the charges, the Court finds the termination of proceedings against Plaintiff was a favorable one.

In an unpublished opinion, the Second Circuit recently reached this conclusion. In *Rivas v. Suffolk County*, 326 F. Supp. 2d 355, 363-64 (E.D.N.Y. 2004), the district court granted summary judgment to a defendant on a malicious prosecution claim where the underlying criminal proceeding was dismissed because the People could not locate the victim-complainant. The Second Circuit reversed, finding that the dismissal was for failure to prosecute and that New York state law holds such dismissals as favorable to the accused. *Rivas v. Suffolk County*, 2008 WL 45406, at *1 (2d Cir. Jan. 3, 2008) (citing *Murphy*, 118 F.3d at 949-50, for the proposition that New York cases hold that "failure to prosecute or failure to comply with speedy-trial requirements should be considered . . . a termination favorable to the accused").

### 2. Probable Cause and Actual Malice

The Court also finds genuine issues of material fact as to the probable cause and actual malice determination for Plaintiff's malicious prosecution claim.

The probable cause to initiate a prosecution is distinct from probable cause to arrest. *Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 417 (2d Cir. 1999). Here, the relevant inquiry is "whether there was probable cause to believe the criminal proceeding could succeed and, hence, should be commenced." *Mejia v. City of New York*, 119 F. Supp. 2d 232, 254 (E.D.N.Y. 2000) (citing *Posr*, 180 F.3d at 417). Thus, for malicious prosecution claims, "the existence, or lack, of probable cause is measured as of the time the judicial proceeding is commenced (e.g., the time of the arraignment), not the time of the preceding warrantless arrest." *Id*. Accordingly, even in situations where probable cause to arrest did not exist at the time of the arrest, inculpatory evidence discovered after the arrest may create the probable cause to initiate criminal proceedings and bar a malicious prosecution claim. In either case, "an arresting officer may be held liable for malicious prosecution when a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors." *Brome v. City of New York*, No. 02-CV-7184, 2004 WL 502645, at *5-6 (S.D.N.Y. Mar. 15, 2004) (internal quotation marks omitted).

The Nassau County District Attorney's Office commenced criminal proceedings against Plaintiff based on the charges filed by Officer Renganeschi and the other officers, which Plaintiff maintains were falsely tailored to support his arrest. *See* N.C. Defs. Ex. H, Dist. Ct. Informations. As recounted above, Plaintiff alleges that Officer Arbisi arrested him immediately upon the officer's arrival onsite in retaliation for Plaintiff's prior complaint against Arbisi and that Renganeschi and the other officers conducted an investigation against Plaintiff only after the

fact to justify the improper arrest. Plaintiff further avers that the officers ignored exculpatory evidence, such as English's eyewitness account that identified Smith as the aggressor and the Cineplex surveillance tapes, which may have captured the altercation on tape. Plaintiff believes that English's statements were known by the police officers and the District Attorney's Office at the commencement of the criminal proceedings but were not shared with defense until the eve of trial. Accordingly, a reasonable jury could conclude that N.C. Defendants manufactured the investigation or improperly disregarded exculpatory evidence to bolster the prosecution of Plaintiff and, thus, a triable issue of fact surrounds this probable cause determination. *See Mejia*, 119 F. Supp. 2d at 288 (refusing to dismiss malicious prosecution claims against an officer who might have misrepresented or concealed the true circumstances of an arrest to the prosecutor).

These allegations also suffice to state a claim for actual malice. *See Ambrose v. City of New York*, No. 02-CV-10200, 2009 WL 890106, at * 18 (S.D.N.Y. Mar. 31, 2009); *Ricciuti v. New York City Transit Auth.,* 124 F.3d 123, 131 (2d Cir. 1997) ("lack of probable cause generally raises an inference of malice sufficient to withstand summary judgment"); *Rounseville v. Zahl*, 13 F.3d 625, 631 (2d Cir. 1994) ("New York courts have held that the existence of malice may be inferred from a finding that defendants lacked probable cause to initiate criminal proceedings.").

Defendant Officers Renganeschi, Arbisi and Leach contend that they are entitled to summary judgment as to the malicious prosecution claim because Plaintiff has not offered any evidence of their involvement with his criminal prosecution after the initial arrest and charge. This argument is unavailing. The "signing of a formal complaint provides a colorable basis for asserting that [an officer] encouraged the filing of charges" for the purposes of a malicious

prosecution claim. *Spiegler v. City of New York*, No. 04-CV-1066, 2006 WL 2587990, at *4 n.7 (S.D.N.Y. Sept. 8, 2006) (citing *Llerando-Rhipps v. City of New York*, 390 F. Supp. 2d 372, 382-83 (S.D.N.Y. 2005)).

Defendants cite *Golub v. City of New York*, 334 F. Supp. 2d 399, 407 (S.D.N.Y. 2004), for the proposition that Plaintiff must present evidence of involvement in the prosecution by police officers after the original arrest and charge to sustain a malicious prosecution claim. Nevertheless, this case is distinguishable because the *Golub* court found that probable cause existed at the time of the plaintiff's arrest and no new facts emerged prior to commencement of his criminal proceeding to dissipate that probable cause. *Id*. Thus, the court required further evidence of involvement by the officers to sustain malicious prosecution claims against the officers. *Id*. Here, a genuine issue of material fact exists as to the probable cause to arrest and, thus, no evidence of post-arraignment involvement by the police officers was necessary.

### 3. Fourth Amendment Deprivation

Finally, a plaintiff asserting a Fourth Amendment malicious prosecution claim under § 1983 must also show some deprivation of liberty consistent with the concept of "seizure." *Rohman,* 215 F.3d at 215. This requirement derives from the Fourth Amendment "right to be free of unreasonable seizure of the person—i.e., the right to be free of unreasonable or unwarranted restraints on personal liberty." *Id*. "[S]ince the gist of a claim for malicious prosecution is abuse of the judicial process, a plaintiff pursuing such a claim under § 1983 must show that the seizure resulted from the initiation or pendency of judicial proceedings." *Murphy*, 118 F.3d at 944.

According to his complaint, Plaintiff returned to court "several times" post-arraignment and that a trial had "actually commenced." Compl. ¶ 17. This was supported by his affidavit which stated that he "had to return to the criminal court in Nassau County on several occasions. . . ." Pl. Aff. ¶ 21. The record also indicates that he had to post bail, N.C. Defs. Ex. I, – a condition of which required him to be amenable to process in New York at all times. *See Smart v. City of New York*, No. 08-CV-2203, 2009 WL 862281, at *5 (S.D.N.Y. Apr. 1, 2009). The Second Circuit has stated that a defendant who was released on his own recognizance but required to make several court appearances and prevented by statute from leaving the state sufficiently alleged a deprivation of liberty that implicated the Fourth Amendment. *Rohman*, 215 F.3d at 216; *see also Kirk v. Metro. Transp. Auth.*, No. 99-CV-3787, 2001 WL 258605, at *15 (S.D.N.Y. Mar. 14, 2001) (defendant's required court appearances rendered him effectively seized because he was "subjected to restraints not shared by the public generally"); *Smart*, 2009 WL 862281, at *5 (the conditions of defendant's bail and his required post-arraignment court appearances constitute a Fourth Amendment seizure). Accordingly, the Court finds that Plaintiff has sufficiently pleaded a "post-arraignment liberty restraint to implicate the plaintiff's Fourth Amendment rights" for purposes of a malicious prosecution claim. *Rohman*, 215 F.3d at 215.

The Court, therefore, denies N.C. Defendants' motion for summary judgment on Plaintiff's malicious prosecution claim.

### C.    Excessive Force

Plaintiff also asserts a cause of action based on excessive force against Defendant Officers. A § 1983 claim for excessive force arising from the detention or arrest of an individual derives from the Fourth Amendment right to be secure from unreasonable seizures. *Jones v.*

*Parmley*, 465 F.3d 46, 61 (2d Cir. 2006). When determining whether police officers have employed excessive force in the arrest context, the Supreme Court has instructed that courts should examine whether the use of force is objectively unreasonable "in light of the facts and circumstances confronting them, without regard to [the officers'] underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397 (1989). The touchstone of the inquiry, then, is reasonableness, and in measuring it, courts "consider the facts and circumstances of each particular case, including the crime committed, its severity, the threat of danger to the officer and society, and whether the suspect is resisting or attempting to evade arrest." *Thomas v. Roach*, 165 F.3d 137, 143 (2d Cir. 1999) (citing *Graham*, 490 U.S. at 396).[7]

In this case, Plaintiff first alleges Officer Arbisi used excessive force when he handcuffed Plaintiff's hands too tightly. Nevertheless, the record indicates that Arbisi re-cuffed Plaintiff to the stretcher in the ambulance approximately two minutes after Plaintiff began complaining about their tightness. Pl. Dep. 126. After Plaintiff again informed the officer that the handcuffs were too tight, Arbisi immediately loosened them. *Id.* at 131-32. Second, Plaintiff contends that Arbisi squeezed his right index finger downwards toward his palm while he was handcuffed to the hospital bed at Franklin General, causing him pain. Plaintiff concedes that he suffered no injuries from either incident. *Id.* at 167.

Under the totality of the circumstances here, these allegations simply do not rise to the level of objective unreasonableness necessary to sustain an excessive force claim. As the Second Circuit has stated, "not every push or shove" is a constitutional deprivation, "even if it may later

---

[7] The denial of summary judgment as to the false arrest claim based on the dispute of fact regarding probable cause above does not alter this Court's inquiry into the excessive force claim. The Second Circuit has held that "the reasonableness test established in *Graham* remains the applicable test for determining when excessive force has been used, including those cases where officers allegedly lack probable cause to arrest." *Jones*, 465 F.3d at 62.

seem unnecessary in the peace of a judge's chambers." *Maxwell v. City of New York*, 380 F.3d 106, 108 (2d Cir. 2004) (quoting *Graham,* 490 U.S. at 396). The Second Circuit has found that allegations that an officer "pushed or pulled or pried" at a plaintiff's fingers were "entirely insufficient" to show excessive force. *Robinson v. Via*, 821 F.2d 913, 923 (2d Cir. 1987). The use of force as articulated by Plaintiff here is *de minimus* and cannot be described as excessive, injurious or unreasonable. Although Plaintiff need not show "permanent or severe" injuries to maintain an excessive force claim, *see Robison*, 821 F.2d at 924, the minimal force applied in these allegations and the lack of any injury whatsoever weigh heavily against Plaintiff. *See Davenport v. County of Suffolk,* No. 99-CV-3088, 2007 WL 608125, at *10 (E.D.N.Y. Feb. 23, 2007) ("[T]here may be certain circumstances where the alleged unconstitutional act and injury are so *de minimis* that it cannot rise to a constitutional violation as a matter of law."). Accordingly, the Court dismisses Plaintiff's excessive force claim.

**D.    Other § 1983 Claims**

The Court dismisses all other claims against Defendant Officers based on § 1983. To the extent Plaintiff asserts a § 1983 claim based on the failure of the police officers to read him his *Miranda* warnings, that claim must fail. While a defendant has a constitutional right not to have a coerced statement used against him, a defendant does not have a constitutional right to receive *Miranda* warnings. *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 346 (2d Cir. 1998) (citing *New York v. Quarles*, 467 U.S. 649, 654 (1984)). The remedy for a violation of the right against self-incrimination is "the exclusion from evidence of any ensuing self-incriminating statements" and "not a § 1983 action." *Neighbour v. Covert*, 68 F.3d 1508, 1510 (2d Cir. 1995).

Accordingly, because Plaintiff cannot base a § 1983 action solely on police officers' failure to administer *Miranda* warnings, summary judgment is granted as to this claim.

Plaintiff's complaint also alleges that he was not afforded medical attention while in police custody. An official "may be found liable for violating the detainee's due process rights if the official denied treatment needed to remedy a serious medical condition and did so because of his deliberate indifference to that need." *Weyant*, 101 F.3d at 856. In this case, no evidence suggests Plaintiff was deliberately denied medical attention for a serious medical condition. On the day of his arrest, a police ambulance transported Plaintiff from the Cineplex directly to Franklin General Hospital. At the hospital, he was examined by a doctor, and given a CAT scan and stitches on his head. Pl. Dep. 82-84. After he was released from the hospital and he was in custody at the police precinct, he did not recall asking the police to take him back to the hospital and he signed a form stating that he was in good health and did not need a doctor. *Id*. at 151; N.C. Defs. Ex. J, N.C. Police Dep't Physical Conditional Questionnaire. Thus, the Court dismisses this claim.

To the extent Plaintiff avers a § 1983 claim based on the denial of access to the bathroom, the record does not support a cause of action. A claim based on the conditions of confinement must assert that the challenged conditions are "punitive" because a pretrial detainee "may not be punished in any manner." *Benjamin v. Fraser*, 343 F.3d 35, 50 (2d Cir. 2003). First, Plaintiff stated in his deposition that he did not recall if he asked to go to the bathroom while he was at the precinct or if he went to the bathroom while there. Pl. Dep. 151. Second, he does not and cannot allege that the conditions were punitive in any way based on the record. Accordingly, this claim is also dismissed. *See Smart*, 2009 WL 862281, at *12.

### E.    Monell Claim

To the extent Plaintiff asserts § 1983 claims against the municipality of Nassau County, the Court dismisses those claims.  In order to hold a municipality liable as a "person" within the meaning of § 1983, the plaintiff must prove the existence of both a policy that shows the municipality took some action that caused his injuries and a causal link between the policy and the deprivation of constitutional rights.  *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978); *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996); *Vives v. City of New York*, 524 F.3d 346, 352 (2d Cir. 2008).  In his complaint, Plaintiff alleges that Defendant Nassau County "with deliberate indifference" failed to properly sanction or discipline police officers for violations of the constitutional rights of citizens or those officers who were aware of and subsequently concealed such violations by other officers "as a matter of policy and practice." Compl. ¶¶ 27-28.  Plaintiff contends that such a policy and practice caused and encouraged police officers to engage in unlawful conduct.  *Id.*  Nevertheless, the record contains no facts that suggest that Nassau County had a custom or policy that caused Plaintiff's injuries, and Plaintiff does not contend otherwise in opposition to the instant motion.  Plaintiff cannot solely rely on the allegations in his pleadings to defeat summary judgment.  *See Gottlieb*, 84 F.3d at 518. Accordingly, all claims alleging violations of § 1983 against defendant Nassau County are dismissed.

### F.    Qualified Immunity

Having found genuine issues of material fact as to Plaintiff's § 1983 false arrest and malicious prosecution claims, the Court examines whether individual N.C. Defendant Officers are entitled to the defense of qualified immunity.  The doctrine of "[q]ualified immunity 'shields

police officers acting in their official capacity from suits for damages . . . unless their actions violate clearly-established rights of which an objectively reasonable official would have known.'" *Jones*, 465 F.3d at 55 (internal quotations omitted). As noted above, the Court finds disputed issues of fact regarding Plaintiff's false arrest and malicious prosecution claims. If, as Plaintiff alleges, (1) Officer Arbisi arrested him prior to any investigation, (2) the officers sought to establish probable cause only after Plaintiff's arrest, and (3) the officers caused a criminal proceeding to be initiated against Plaintiff based on the improper arrest, then the officers unreasonably and in bad faith violated Plaintiff's long-established "right to be free from arrest or prosecution in the absence of probable cause" and they are not entitled to qualified immunity. *See Ricciuti*, 124 F.3d at 128. Accordingly, Defendant Officers' defense of qualified immunity to Plaintiff's false arrest and malicious prosecution claim is denied.

## G.    Pendent State Law Claims

Defendants contend that Plaintiff's pendent state law causes of action for false arrest, unlawful imprisonment, intentional infliction of emotional distress, and assault and battery are all barred as a matter of law because Plaintiff failed to file a notice of claim within the 90-day statutory time period set in N.Y. GEN. MUN. LAW ("GML") § 50-e(1)(a). In New York, service of a notice of claim is a condition precedent to the commencement of a tort action against municipal defendants. *Laroc v. City of New York*, 847 N.Y.S.2d 677, 678 (N.Y. App. Div. 2007). The same requirement applies to tort claims against counties and county employees. *See Henneberger v. County of Nassau*, 465 F. Supp. 2d 176, 198-99 (E.D.N.Y. 2006) (citing N.Y. COUNTY LAW § 52). The failure to serve the notice within the GML § 50-e's 90-day limit makes it a nullity. *Laroc*, 847 N.Y.S.2d at 678. This procedural requirement applies to state-law claims

even when brought in federal court.  *See Hardy v. N.Y.C. Health & Hosps. Corp.*, 164 F.3d 789, 793 (2d Cir. 1999).

In an action for false arrest or false imprisonment the GML § 50-e(1)(a) 90-day period commences on the day the plaintiff is released from actual custody.  *Parker v. City of New York*, No. 05-CV-1803, 2008 WL 110904, at *12 (S.D.N.Y. Jan. 7, 2008) (citing *Salman v. Econo Lodge*, 755 N.Y.S.2d 678, 678 (N.Y. App. Div. 2003)); *Bennett v. City of New York*, 612 N.Y.S.2d 201, 201 (N.Y. App. Div. 1994).  In this case, Plaintiff was arrested on October 13, 2002 and released from jail in the early hours of October 14, 2002.  Thus, the 90-day limit to file the notice of claim on the false arrest or imprisonment causes of action commenced on October 14, 2002 and ended on January 12, 2003.[8]  Since the notice of claim was postmarked and signed on January 13, 2003, Plaintiff missed the statutory deadline by one day.

The late service of the notice of claim was thus a nullity and this Court is not at liberty to cure this defect.  *See Santiago v. City of New York,* 742 N.Y.S.2d 566, 566 (N.Y. App. Div. 2002) (dismissing plaintiff's claims for failure to timely serve notice of claim where notice was served on defendants four days late); *Pavlicko v. City of New York*, 392 N.Y.S.2d 77, 77 (N.Y. App. Div. 1977) (minor's cause of action against the City barred because guardian served notice of claim two days late); *White v. City of New York*, 135 N.Y.S.2d 692, 693 (N.Y. App. Div. 1954) (suit precluded where notice of claim was filed one day late).

While GML § 50-e(5) permits a court to extend the time for serving a notice of claim upon an application for leave to serve a late notice, Plaintiff never sought leave to file a late notice and GML § 50-e(5) bars Plaintiff from filing a late notice of claim more than one year and

_____

[8]  The parties dispute how to determine the statutory time period.  To compute the 90-day period, counting begins the day after the day the claim arose (i.e., day one is the day after the claim commences).  *See* N.Y. GEN. CONSTR. LAW § 20.  Accordingly, day one was October 15, 2002, day two was October 16, 2002, and so forth.

ninety days after the claim arose. *See Singleton v. City of New York*, 865 N.Y.S.2d 600, 601 (N.Y. App. Div. 2008). Thus, Plaintiff was required to file a late notice of claim by January 12, 2004 at the latest and he failed to do so.

Plaintiff's malicious prosecution claim requires a slightly different analysis. The cause of action did not accrue until the criminal charges against him were terminated in his favor on August 1, 2003. *See Peresluha v. City of New York*, 400 N.Y.S.2d 818, 820 (N.Y. App. Div. 1977). Defendants claim that, since the notice of claim was filed on January 13, 2003, it was premature and this claim must be dismissed as well. The Court agrees and dismisses the state tort malicious prosecution claim. *See Guzman v. City of New York*, 653 N.Y.S.2d 143, 144 (N.Y. App. Div. 1997) (dismissing malicious prosecution claim where notice was given more than six month prior to the termination of criminal charges); *Colena v. City of New York*, 414 N.Y.S.2d 220, 221-22 (N.Y. App. Div. 1979) (holding that a notice of claim for a malicious prosecution cause of action served forty-nine days prior to the dismissal of the underlying charge was insufficient to comply with GML § 50-e). *But see Ferrick v. City of New York*, 489 N.Y.S.2d 491, 492 (N.Y. App. Div. 1985).

For the foregoing reasons, summary judgment is granted dismissing Plaintiff's state law tort claims against N.C. Defendants in their entirety.

## III. Non-Nassau County Defendants' Summary Judgment Motion

Plaintiff also brings suit against Non-Nassau County Defendants ("N.N.C. Defendants"). Plaintiff alleges violations of state law, namely, false arrest; false imprisonment; malicious prosecution; negligent hiring, training, and retention; assault and battery; and negligence. N.N.C. Defendants seek summary judgment dismissing all claims based on the lack of subject

matter jurisdiction and, in the alternative, based on Plaintiff's inability to establish these state claims.  The Court denies N.N.C. Defendants' motion in part and grants it in part.

### A.      Supplemental Jurisdiction

N.N.C. Defendants first ask this Court to dismiss claims against them for want of subject matter jurisdiction.  Defendants contend that since Plaintiff's claims against them are brought solely under New York State law, this Court should decline to exercise supplemental jurisdiction.

Under 28 U.S.C. § 1367(a), federal courts have supplemental jurisdiction to hear state law claims that are so related to federal question claims as to "form part of the same case or controversy under Article III of the United States Constitution."  *Briarpatch Ltd., L.P v. Phoenix Pictures, Inc*., 373 F.3d 296, 308 (2d Cir. 2004).  A state law claim forms part of the same controversy if it and the federal claim "derive from a common nucleus of operative fact."  *Id.* This principle applies even if the state law claims are asserted against parties different from the ones named in the federal claims.  *Kirschner v. Klemons*, 225 F.3d 227, 239 (2d Cir. 2000).

Here, Plaintiff's federal and state law claims both derive from the altercation which occurred at Sunrise Cineplex on October 13, 2002 and his subsequent arrest.  As decided herein, the Court has not granted summary judgment with respect to two federal law claims and, thus, the Court retains original jurisdiction over the federal matter.  None of the factors laid out in 28 U.S.C. § 1367(c) in favor of declining supplemental jurisdiction significantly pertain to this case. Accordingly, the federal and state causes of action arise out of a "common nucleus of operative fact" sufficient to join these two species of claims into one action and this Court asserts

supplemental jurisdiction over Plaintiff's state law claims against N.N.C. Defendants.

*Kirschner*, 225 F.3d at 239.

### B.      False Arrest, False Imprisonment and Malicious Prosecution

Plaintiff asserts state law claims of false arrest, false imprisonment, and malicious prosecution against N.N.C. Defendants.  As civilian complainants in the criminal action, Smith and Gonzalo will not be held liable for these state tort claims "by merely seeking police assistance or furnishing information to law enforcement authorities who are then free to exercise their own judgment as to whether an arrest should be made and criminal charges filed."  *Levy v. Grandone*, 789 N.Y.S.2d 291, 293 (N.Y. App. Div. 2005) (internal quotation marks omitted). "Nor does identifying plaintiff as the perpetrator of a crime, signing the summons or testifying at trial give rise to tort liability."  *Du Chateau v. Metro-North Commuter R. Co.,* 688 N.Y.S.2d 12, 15 (N.Y. App. Div. 1999).  Nevertheless, a claim may arise where defendants "played an active role in the prosecution, such as giving advice and encouragement or importuning the authorities to act" or "affirmatively induced the officer to act, such as taking an active part in the arrest and procuring it to be made or showing active, officious and undue zeal, to the point where the officer is not acting of his own volition[.]" *Levy*, 789 N.Y.S.2d at 293 (internal quotation marks omitted).  Thus, a claim of false arrest may lie "where a plaintiff can 'show that . . . defendants instigated his arrest, thereby making the police . . . agents in accomplishing their intent to confine the plaintiff.'"  *Weintraub v. Bd. of Educ. of City of New York*, 423 F. Supp. 2d 38, 56 (E.D.N.Y. 2006) (quoting *Carrington v. City of New York,* 607 N.Y.S.2d 721, 722 (N.Y. App. Div. 1994)).

Plaintiff cannot succeed on these state law claims because they are wholly inconsistent with his pleaded factual assertions.  Previously, Plaintiff has laid the blame for his arrest squarely

on Officer Arbisi. Plaintiff has repeatedly asserted in this litigation that Arbisi, motivated by bad faith, arrested him immediately at the scene of the disturbance before conducting any investigation whatsoever. For example, his complaint states that Arbisi "was the first officer on the scene, however as soon as defendant [Arbisi] realized[] who the plaintiff was he placed the injured plaintiff under arrest . . . without any investigation. . . ." Compl. ¶ 13. Furthermore, in his motion papers against the N.C. Defendants, Plaintiff asserts his arrest "was prior to any investigations being conducted by the responding police officers." Pl.'s Mem. Law Opp'n N.C. Summ. J. Mot. 5. He also submitted an affidavit by Legister supporting this contention. *See* Legister Aff.

Plaintiff cannot now attempt to establish that N.N.C. Defendants instigated his arrest because, under the facts pleaded in his complaint, he was arrested before either defendant spoke to Arbisi. "A party's assertion of fact in a pleading is a judicial admission by which it normally is bound throughout the course of the proceeding." *Bellefonte Re Ins. Co. v. Argonaut Ins. Co.*, 757 F.2d 523, 528 (2d Cir. 1995). While a plaintiff may plead inconsistent claims under Rule 8(e)(2) of the Federal Rules of Civil Procedure, he cannot escape summary judgment on those claims simply by picking and choosing his historical facts at will. *See Nat'l W. Life Ins. Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 175 F. Supp. 2d 489, 492 (S.D.N.Y. 2000) ("[T]here is no authority for the proposition that within a statement of a given claim a party may assert as fact two assertions that directly contradict each other."). Consequently, notwithstanding Plaintiff's assertions in these motion papers that Smith and Arzon implicated Plaintiff to the police prior to his arrest, Plaintiff should be held to his factual pleadings that Arbisi arrested him before speaking to anyone besides Legister because "stipulations and admissions in the pleadings

are generally binding on the parties and the Court." *PPX Enters., Inc. v. Audiofidelity, Inc.*, 746 F.2d 120, 123 (2d Cir. 1984) (holding that the district court was bound to accept stipulated facts in deciding motion for summary judgment). The Court disregards Plaintiff's statements in this motion paper that N.N.C. Defendants "undisputedly spoke to the police before . . . plaintiff's arrest." Pl.'s Mem. Law & Affirm. Opp'n to Non-N.C. Defs. Mot. Summ. J. 13; *see Aziz Zarif Shabazz v. Pico*, 994 F. Supp. 460, 470 (S.D.N.Y. 1998) ("[U]nder the case law of this Circuit, plaintiff's opposition papers may be properly disregarded based on his inconsistent and contradictory statements.").

Accordingly, Plaintiff cannot sustain state law claims for false imprisonment, false arrest, or malicious prosecution against N.N.C. Defendants because Smith and Arzon did not instigate the arrest or commence the prosecution against him since Arbisi allegedly arrested Plaintiff before encountering either defendant. Furthermore, it is undisputed that N.N.C. Defendants made no 911 calls to the police and, thus, it cannot be said that they were seeking the police to "accomplish[] their intent to confine the plaintiff." *Weintraub*, 423 F. Supp. 2d at 56 (finding a false imprisonment claim where the defendants contacted the police in an effort to have plaintiff arrested). The cases cited by Plaintiff in his opposition papers are unavailing because none of them demonstrate that a defendant may be liable for false arrest or malicious prosecution where the defendant did not speak to the police until after an arrest was made. *See Arum v. Miller*, 273 F. Supp. 2d 229, 234 (E.D.N.Y. 2003); *Weintraub*, 423 F. Supp. 2d. at 56; *Schiffren v. Kramer*, 640 N.Y.S.2d 175, 177 (N.Y. App. Div. 1996).[9] Finally, as noted above, the dismissal of Plaintiff's underlying criminal charges was based on N.N.C. Defendant Smith's failure to testify

---

[9] Plaintiff also maintains that the law extends liability to defendants whose statements are merely "contributory to the arrest." Notwithstanding that Plaintiff offers no legal precedent for this argument, there would be no liability in this case as defendants did not contribute in any way to Arbisi's decision to arrest Plaintiff under his pleaded version of events.

at Plaintiff's criminal trial. Accordingly, the Court finds that Plaintiff cannot show that N.N.C. Defendants "initiated" or "instigated" his arrest in order to sustain state law claims for false arrest and imprisonment and malicious prosecution.[10]

## C. Negligent Hiring, Training and Retention

N.N.C. Defendants next seek summary judgment against Plaintiff's negligent hiring, training, and retention claim. A necessary element of a cause of action for negligent hiring is that "the employer knew or should have known of the employee's propensity for the conduct which caused the injury." *Brancato v. Dee and Dee Purchasing, Inc*., 745 N.Y.S.2d 564, 565 (N.Y. App. Div. 2002) (quoting *Kenneth R. v Roman Catholic Diocese of Brooklyn*, 654 N.Y.S.2d 791, 793 (N.Y. App. Div. 1997)).

In this case, Plaintiff asserts that Defendants Sunrise Cineplex through National Amusements and S.E.B. should be held liable for Smith's alleged assault on him because they knew or should have known about Smith's prior criminal record for domestic violence. Nevertheless, in general, "[a]n employer is under no duty to inquire as to whether an employee has been convicted of crimes in the past." *Yeboah v. Snapple, Inc*., 729 N.Y.S.2d 32, 33 (N.Y. Div. App. 2001) (citing *Amendolara v. Macy's New York*, 241 N.Y.S.2d 39, 40 (N.Y. App. Div. 1963)). "Liability will attach on such a claim only when the employer knew or should have known of the employee's violent propensities." *Yeboah*, 729 N.Y.S.2d at 33.

---

[10] In these opposition papers, Plaintiff seemingly maintains for the first time that he is suing N.N.C. Defendants under 42 U.S.C. § 1983. Pl.'s Mem. Law & Aff. Opp'n Non-N.C. Defs. Mot. Summ. J. 1, 13. Nevertheless, his complaint makes clear that the "First Cause of Action" under 42 U.S.C § 1983 only pertains to "Defendants Officers" and the factual allegations related to the § 1983 claims only refer to actions of the defendant officers. Compl. ¶ 7. They do not allege that N.N.C. Defendants acted under the "color of state law" nor do they even mention N.N.C. Defendants at all. It is inappropriate for Plaintiff to raise claims against defendants for the first time in opposition papers to a summary judgment motion. *See Bonnie & Co. Fashions v. Bankers Trust Co*., 170 F.R.D. 111, 119 (S.D.N.Y. 1997).

Plaintiff failed to produce any evidence showing Defendants National Amusements or S.E.B. knew or should have known of Smith's alleged violent inclinations, which may have made this incident foreseeable. While the record does indicate Smith had multiple arrests for domestic violence, *see* Smith Dep. 12-13, 118-199, 127, it is also true that Smith denied having been convicted of any crimes in his S.E.B. "pre-employment application." N.N.C. Defs. Ex. I, Smith Personnel File. Furthermore, a notarized letter from S.E.B.'s C.E.O., Robert DiNozzi, indicates that neither Smith nor Arzon have any disciplinary notices in their personnel files. N.N.C. Defs. Ex. H, DiNozzi Letter. Smith was duly registered by the New York State Department of State to serve as a security guard and he indicated to S.E.B. that he had completed the 8-hour Pre-Assignment course for security guards as well as the state-mandated 16-hour training course for security guards. Ex. I. Plaintiff cites no case law demonstrating that this was not sufficient training for the post of a security guard at a movie theater. Under these facts, nothing in the record indicates that S.E.B. knew or should have known about Smith's alleged violent propensities or that Smith was improperly trained and retained to trigger liability. Accordingly, the Court grants summary judgment dismissing Plaintiff's negligent hiring, training, and retaining claim against all N.N.C. Defendants.

### D.    Assault and Battery

The Court denies N.N.C. Defendants' motion for summary judgment as to the assault and battery claim. Plaintiff has sufficiently presented evidence in the form of his affidavit, along with those of Anna Mae Legister, and Kevin English,[11] to allege that Smith was the aggressor in the altercation, making this a triable issue of fact. To paraphrase Judge Glasser in *Weintraub*, the

---

[11] After this summary judgment motion was fully briefed, N.N.C. Defendants requested that this Court strike English's affidavit because Plaintiff failed to disclose the information contained in the affidavit during discovery. The Court does not decide this issue here. Even without the English affidavit, the Court would find a triable issue of fact on the assault and battery claim.

truth of what actually occurred at the Cineplex between Plaintiff, Smith, and Arzon is disputed: If a jury were to believe Plaintiff's account that Smith took the first swing at him, it would reasonably infer that Plaintiff was assaulted by Defendants. *See* 423 F. Supp. 2d at 56. Thus, the Court is precluded from dismissing the assault and battery claims against N.N.C. Defendants.

### E. Intentional Infliction of Emotional Distress

Defendants also argue that Plaintiff cannot raise a claim of intentional infliction of emotional distress ("IIED"). Under New York law, a plaintiff must satisfy four elements to establish a claim of IIED: (1) extreme and outrageous conduct, (2) intent to cause severe emotional distress, (3) a causal connection between the conduct and the injury, and (4) severe emotional distress. *Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 121 (1993). The New York Court of Appeals has emphasized, however, that "[l]iability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Id*. at 122 (internal quotation marks omitted). The court has also strongly cautioned against claiming IIED where other tort remedies are available. *See Fischer v. Maloney*, 43 N.Y.2d 553, 558 (1978). Accordingly, "[n]o intentional infliction of emotional distress claim will lie where the conduct underlying the claim falls within the ambit of traditional tort liability." *Hansel v. Sheridan*, 991 F. Supp. 69, 75 (N.D.N.Y. 1998).

In the instant case, the alleged conduct is entirely encompassed in plaintiff's traditional tort claims for malicious prosecution and assault and battery. Thus, Plaintiff's claim for IIED must be dismissed. *See Moore v. City of New York*, 219 F. Supp. 2d 335, 339 (E.D.N.Y. 2002).

### F. Negligence

N.N.C. Defendants finally seek summary judgment dismissing Plaintiff's negligence claim. N.N.C. Defendants contend that where a plaintiff's claim is "premised upon a defendant's allegedly intentional conduct, a negligence claim with respect to the same conduct will not lie." *Naccarato v. Scareselli*, 124 F. Supp. 2d 35, 45 (N.D.N.Y. 2000). Indeed, "New York has adopted the view that, 'once intentional offensive contact has been established, the actor is liable for assault and not negligence, even when the physical injuries may have been inflicted inadvertently.'" *Oliver v. Cuttler*, 968 F.Supp. 83, 92 (E.D.N.Y. 1997) (quoting *Mazzaferro v. Albany Motel Enters., Inc.*, 515 N.Y.S.2d 631, 632-33 (N.Y. App. Div. 1987)).

Since Plaintiff has alleged facts supporting a claim for assault and battery, he may not also base a claim of negligence on the same conduct. *See Vilkhu v. City of New York*, No. 06-CV-2095, 2008 WL 1991099, at *9 (E.D.N.Y. May 5, 2008); *Busch v. City of New York*, No. 00-CV-5211, 2003 WL 22171896, at *7 (E.D.N.Y. Sept. 11, 2003); *Dineen ex rel. v. Stramka*, 228 F. Supp. 2d 447, 454 (S.D.N.Y. 2002). To the extent Plaintiff seeks to recast this negligence claim as a negligent hiring, training, and retaining claim against National Amusement and S.E.B., the Court denies the request. Plaintiff has already asserted such claim and there is no reason to permit a duplicative cause of action. Accordingly, Plaintiff's negligence claim against N.N.C. Defendants is dismissed.

## CONCLUSION

For the foregoing reasons, Nassau County Defendants' and Non-Nassau County Defendants' motions for summary judgment are denied in part and granted in part.

The Court grants summary judgment for and hereby dismisses the following claims: Plaintiff's First Cause of Action for excessive force, failure to receive *Miranda* warnings, failure

to afford medical attention, and the denial of access to the bathroom in violation of § 1983 against Nassau County Defendant Officers; Plaintiff's Second and Third Causes of Action for excessive force, false arrest and malicious prosecution in violation of New York State law against Defendant Officers; Plaintiff's Fourth Cause of Action of assault and battery against Defendant Officers; Plaintiff's Fifth Cause of Action for false arrest and false imprisonment against all Defendants; Plaintiff's Sixth Cause of Action for Intentional Infliction of Emotional Distress against all Defendants; Plaintiff's Seventh Cause of Action for negligent hiring, training and retention against defendant Nassau County, Sunrise Cinemas, National Amusements, Inc., and S.E.B. Inc.; and Plaintiff's Eighth Cause of Action for negligence against all Defendants. All claims asserted against defendant Nassau County are hereby dismissed.

The Court denies Defendants' summary judgment motions as to following claims: Plaintiff's First Cause of Action for false arrest and malicious prosecution in violation of § 1983 against Defendant Officers and Plaintiff's Fourth Cause of Action for assault and battery against Non-Nassau County Defendants. Furthermore, Defendant Officers have failed to establish qualified immunity with respect to the false arrest and malicious prosecution claims. These claims survive Defendants' summary judgment motions and may proceed to trial.

**SO ORDERED.**


Dated: Brooklyn, New York
        September 1, 2009

_____/s/_____
SANDRA L. TOWNES
United States District Judge